Next case is Hanley Industries v. the Secretary of the Army, 2006. The key issue on the appeal before us this morning is the nature of the bargain between the government and Hanley Industries under the Critical Characteristics Clause. Under that clause, the government terminated you for default for failing to meet the schedule. But I don't think that's true. I don't think the default notice said that you were being defaulted for failure to meet the deadline, right? That's why the key issue is the Critical Characteristics Clause, Judge. I think so. I think they also mentioned the deadline, though. The board does mention the deadline. But the default termination notice didn't mention the deadline, right? I think you may be right. So why did we worry about whether there was a waiver of the deadline that wasn't relied on for the default termination? Well, the board implicitly found, according to the analysis in our brief, that there was a waiver. I'm not so sure she didn't mention it in her final decision. I'd have to review it again, Judge. But clearly the board found that they had missed the deadline. There was a stop work order under the Critical Characteristics Clause. So, but Hanley argues in any event that they clearly, the contracting officer, clearly encouraged continued performance after that deadline. That may be. The problem is it doesn't seem to be relevant because that wasn't the ground for the termination. Well, that's why I was starting off with the Critical Characteristics Clause. But in the brief under your argument for the government breach of its implied duty to cooperate at 49, you say, perhaps most importantly, the government already knew both the cause of the rupture and where the non-metallic inclusion and lack of form, and assert that its rationale for terminating Hanley because it did not investigate the foundry suggests bad intent on the part of the government. In fact, the relevant email in the record says Webco did not elaborate on what the non-metallic contaminant was or how it got into the process, and that Webco could have performed energy dispersive x-ray spectrography to try to determine what the inclusion might have been. So where in the record does it show that the government already knew what the contaminant was or how it got into the process? Well, the Webco report goes into detail on that. It was submitted on May 5th, and there's an email where the government metallurgist examined the Webco report in which he found that it was excellent, and in fact found that the quality of the steel was good, and I believe that that is found at A2434. So the government itself received the Webco report and its findings, agreed with those findings, but ended up ignoring the findings, didn't even communicate them back to Hanley, didn't discuss them with Hanley. It did come up with certain comments about the foundries your Honor recognizes, but that was only in the final decision. They never once requested Hanley to go back to the foundry, whatever good that might have done before the final decision. They essentially ignored the findings in the Webco report and terminated Hanley for failing to come up with a root cause when in actuality they had agreed with the root cause that was in the Webco report. In the blue brief a couple of pages earlier, you say that Hanley switched to Webco during its production of future primers because it would allow for faster production. In fact, the switch was because the previous supplier had raised its prices. Isn't that right? That was one factor. Yes, Judge. Well, where in the record does it indicate that faster production was the primary reason for the switch? You know, I don't have at my fingertips that particular reference. Does it exist? Pardon me? Does it exist? I've seen it somewhere, Judge. But it was a combination of factors that decided to go with Webco. And it was on August 23rd, the day after the deadline, when they had a big telephone conference, that they all decided, and Hanley believed it was a mutual decision, that they would go with a Webco steel. Webco still held out the opportunity of using Plymouth, but it would be a longer lead time. It was eight weeks at the time they were discussing it, but they required clear direction from the government as to whether or not it wanted to go back to Plymouth or not because otherwise the decision was to go forward with Webco because of price, because of better lead time, because of other issues. I think the testimony indicates that Plymouth was just very difficult to deal with. They really didn't appreciate the business, didn't appear to want the business. So Hanley decided to go with Webco. And they decided to also use a new process that wasn't even contractually required called centerless grinding, which is a very elaborate process, very accurate process to make sure that the tubes are very close in terms of their dimensions. This all relates to the hydrostatic testing, which was intrinsic to the critical characteristics clause because there was a tube rupture, obviously, and the process at GORMAC, the subcontractor, was temporarily shut down. And then the CO criticized the testing procedure because not all measurements were taken. 10% of the tubes were measured before the test rather than 100%. But the CO offered in her April 7th letter an opportunity for Hanley to show that nonetheless the tubes would, in essence, have passed that test in the form of a statistical analysis. That was an option she gave to Hanley. And because of the centerless grinding procedure, Hanley had a number of measurements of the tubes, outer diameter measurements, that were all very... To do a scatter diagram, they were very close on point to the 0.763 outer diameter that they were trying to reach. And that was because of the centerless grinding process. And they simply did a statistical analysis to figure out the standard deviation of all of those measurements. And then they figured out the probability of what it would be for a measurement to be in the lower order, the 0.762, such that it might be possible for a tube to expand more than 0.003 inches and trigger the snap gauge that GORMAC had set up to determine the maximum point of the test. And the probability of that happening, Hanley concluded, was one in a million. And they submitted the documentation, the measurements from Banner, the subcontractor to GORMAC, to prove that statistical analysis. And the government never responded. The government also didn't respond to several other questions or information that it had received in response to its questions. There was an issue about the acceptance inspection equipment, the AIE. Hanley submitted on May 27th a very copious list of all the equipment that the government was welcome to inspect at GORMAC and pass, so it could pass the AIE clause. The government never responded to that list, never indicated in any respect how it was erroneous. But your client was required to conduct certain tests, isn't that right? Yes, Judge. Radiographic inspection and x-rays and completed primers. I don't believe that those were required by the contract. Some of those were done. Hanley suggested that some of those could be done. The main test was a hydrostatic test. It was a pressure test, which I've already described at length. And Hanley, we submit, should have proved to the satisfaction of the government that, in essence, the requirements were met. Where in the record was there an explanation of why certain parts of the documentation that were submitted were whited out? I know those references. I'm not sure that there are specific areas that further address those, the whiteouts. And markovers, I think. Pardon me? I think they were whited out and marked over. Yeah. But, you know, in my experience, technicians probably should use a new page, but very often they make an error in handwriting or something and white over it and rewrite it. It doesn't necessarily indicate that it's repaired. That's your experience, but there wasn't an explanation in the record, was there? Not that I recall, Judge. As I understand it, these are detonators. Yes. End product. Right. So people can die if it doesn't work. Yes, Judge. Yeah. And that's why Hanley was so proud of its test, which indicated that they believed they were submitting a safe product. So, in fact, the hydrostatic test itself is designed to weed out any tubes that have a weakness in them. Very often it's kind of confusing. Some people think that if you get a ruptured tube, you've got to stop production for a long period of time in order to determine exactly what's going on, and that's true to a point. I mean, but as the test reports here show, the Webco report in particular, if it's not a metallic defect, and these are found to be nonmetallic defects, in other words, more likely it was a piece of dust in the foundry that found its way into the molten steel, and in the cold working process, it resulted in what's called an ID, or inner diameter lap, and those are unavoidable. They always occur. In fact, the Propellix, the contractor before Hanley, saw many instances of it. So the test is designed to actually destroy those tubes that have the weakness in it so that they can be discarded and you move on with the production process. You want to save rebuttal time? Yes. Continue or save it? A couple more seconds, Judge, and I'll reserve the rest. So the point was to discard the ones that were defective, continue with the process, do a restart under the Critical Characteristics Clause. But the government never worked closely, never cooperated with Hanley, to reach that goal of restarting the production. I'll reserve every minute of time for rebuttal, Judge. May it please the Court. I don't understand why you spend a significant part of your brief defending something which didn't happen here, which is a termination for default for failing to meet the deadline. It's just not involved in the case. Your Honor, respectfully, we would disagree. It is, in fact, a part. Why is it involved in the case? It wasn't part of the default termination. It was not the failure to meet the deadline. Your Honor, that was one of the bases, only one. We have multiple bases for defaulting. Show me where in the default termination notice there was a mention of the failure to meet the deadline. Your Honor, under the default clause, Federal Acquisition Regulations Section 52.249-8, which is the default clause in the contract that was incorporated by reference in the contract, and that's page 134. Where in the default notice is there reference of failure to meet the deadline? There is none in the default notice that I recall, Your Honor, because none is required, because the default clause itself in the contract only requires a show cause notice in circumstances where endangered performance occurs. And that's, and I can direct you to 52.249-8. You can default somebody without giving them notice of the reason? Correct, Your Honor. And this Court's precedent in general injectables states that it is a prima facie basis to default the day something comes due. Does that case hold that you don't have to give them notice of it? Correct, Your Honor, because that's what the clause says. The clause says notice is only required. Was that a case in which there was no notice of the failure to meet the deadline? I don't recall if there was, but, Your Honor, the due date. Well, you said there was, but so maybe there isn't. Well, Your Honor, between general injectables of this Court and also Empire Energy, it's a prima facie case where the due date comes, when the due date is there, the date is always considered a requirement of the contract. When there's a due date and the due date comes due. Of course it's a requirement of the contract. The question is whether you can default somebody without giving them notice that they failed to meet the due date. We would respectfully. I'm asking for authority that that's permissible, and so far you haven't cited that. Well, I think general injectables does support that, Your Honor. I think also the FAR default clause, in fact, supports it. Does that decide that you don't have to give them notice? Well, Your Honor, the default clause itself states that notice is not required. It's not the same thing. I asked you whether the case addressed that issue. I don't recall if it did, Your Honor. Then it's not authority to address the issue. We believe the fact that the Court stated, and I believe it does state, that it's a prima facie basis for default means that you don't actually have to provide notice. If the due date comes due, then default occurs. Of course, that's not the only basis for defaulting Hanley. As Your Honor, Judge Wallach stated, this is a munition. It's not a flagpole. Specs are important. They didn't follow the specs here. There were many basis to default them that we did include in the show cause clause. To the extent the Court determines that that is a necessity, again, we would respectfully disagree. But the first article test clause was breached. The hydrostatic testing was breached. The acceptance inspection equipment clause was breached. The flow down of quality control procedures, all breached. These are all important factors, particularly when you have a munition. These are big guns. They sit on the decks of destroyers and cruisers, and if something goes wrong, people will die. So we believe that the Board made strong findings of fact, and they are factual determinations that this Court should uphold. They're not arbitrary. They're not capricious. They are backed up by substantial evidence, and we believe that the Board did a good job in summarizing this case, and we believe it should be upheld. And absent further questions from the Court, we respectfully request that the Court affirm the Board's decision, finding that the Army acted reasonably, terminating Hanley Industries, and we thank you. Thank you, Mr. Goodfellow. Mr. Eklund has some rebuttals on it. Thank you. Just in response, first of all, to one of the questions, in terms of record evidence of Plymouth taking longer, there was some statements to that effect in Hanley's response to the show cause notice, particularly at A1558, where Mr. Gaynor-Blake of Hanley says that, if the government insists, we will order tubing from Plymouth. The tubing will take many weeks longer to get, cost more, will be subject to rare hydrostatic test failures, and will not be certified by the manufacturer in MIL-T15119A. Hanley requests clear direction on this question, et cetera, et cetera. They never did get that clear direction, and so they did not pursue using Plymouth, which they would have been more than happy to do if the government were willing to set up a new delivery schedule, which they never got back to Hanley on. They couldn't set up a new delivery schedule, so they went with Webco. So in summary, I mean, the findings of the Webco report and what the government did with them that support the reversal of the Board's decision for three reasons. First, the government's failure to cooperate or even to communicate with Hanley regarding the government's agreement on the findings in the Webco report, combined with the fact that the government ultimately ignored the findings of the Webco report, constitute the government's breach of the duty of good faith and fair dealing, particularly as it relates to the critical characteristics clause. And this constitutes a material breach, which, as we discuss in our brief, without more automatically converts the default termination to a termination for convenience, because we're dealing with the duty of good faith and fair dealing. It precludes also any alternative findings supporting the government's termination for default. Second, the Board's failure to acknowledge the Webco report itself as contradictory evidence, tending to prove that Hanley complied with the government's demands and that the government agreed with the Webco report, show that the Board's conclusion that the government acted reasonably in terminating Hanley is not supported by substantial evidence. It's got to look at the whole evidence, including all contradictory evidence, which included the Webco report, which everyone at this point in time seems to be ignoring. Third, and finally, the fact that the Webco report itself is the product of the government's request to Hanley to continue contract performance under the critical characteristics clause long after the contractual delivery deadline of April 22 had passed indicates that the government waived the 22 April contractual delivery deadline, such that any reliance upon that deadline cannot support any finding of termination for cause. As a consequence, Hanley respectfully submits that this court should reverse the Board's decision and convert the government's termination for default into a termination for convenience, or alternatively, the court should remand this matter back to the Board for factual findings reflecting the entire record, including the Webco report, and all other contradictory evidence, including the submissions that Hanley made constantly to the government, but the government never responded to. Thank you. Thank you, Mr. Kirkland. We'll take the case on revising.